JULIUS S. SHAILER *vs.* JOSIAH F. BUMSTEAD & others.

On the trial of issues whether the execution of a will was procured by fraud or undue in fluence, and whether the will was executed by the testatrix in ignorance of its contents, after the introduction of evidence of a previous condition of her mind having relation to the disposal of her property, evidence of her subsequent acts or declarations is admissible to prove the subsequent existence of that condition, if such acts or declarations are significant of a condition sufficiently permanent in its nature, and occurred so soon after the execution of the will as to afford a reasonable inference that such was then also the con· dition of her mind; but such evidence is inadmissible to prove the actual fact of fraud or undue influence in another.

On the trial of issues whether the execution of a will was procured by fraud or undue influ ence, and whether the will was executed by the testatrix in ignorance of its contents, evi dence of her subsequent acts or declarations indicating dissatisfaction with or ignorance of

its contents is admissible to rebut any presumption of the free execution of the will which may arise from the fact that it remained unrevoked for any considerable time

On the offer of a will for probate, evidence of declarations or acts of parties to the record, subsequent to the execution of the will, whether before or after the death of the testatrix, is inadmissible to prove that the will "was contrary to her intentions, or that she was ignorant of its contents, and that it was procured by fraud and undue influence of" such parties, if there are other parties to be affected thereby who are not jointly interested nor in privity with them.

On the offer of a will for probate, the testatrix is not such "an original party to the contract or cause of action" as to render any party to the record incompetent as a witness, under the Gen. Sts. *c.* 131, § 14.

On the trial of the validity of a will executed when the testatrix was seventy-eight years old, there is no ground of exception to the exclusion of evidence of her mental and moral condition fifteen months afterwards, when she was affected with paralysis; and also of evidence of her bodily and mental condition at subsequent periods until her death at the age of ninety-one; which is offered to prove that she was weak in body and mind when she executed the will.

On the trial of the validity of a will executed when the testatrix was seventy-eight years old, there is no ground of exception to the exclusion of evidence "that several of her family had been in advanced age affected with paralysis accompanied by an enfeebling of the mental and moral powers, and that it was a family tendency," which is offered "as bearing on the question of the condition of her mental and bodily powers" at the time when she executed the will, and for the introduction of which the only foundation laid is, evidence that two years before that time she complained of feeling numb, and at that time and afterwards was physically weak and somnolent and mentally inactive, and an offer of evidence that fifteen months after executing the will she was affected with paralysis.

On an appeal from the allowance, as the last will of a person deceased, of a will, and of a codicil thereto executed several years afterwards, like issues for a jury, including the issue whether the execution of the instrument was procured by fraud or undue influence, having been framed, as to a will executed several years previously; as to the will allowed; and as to the codicil thereto; it was alleged that, during the interval between the execution of the will allowed and the execution of the codicil, the physical and mental powers of the testatrix were seriously affected by sickness; whereupon the judge denied a request of the appellants for a trial of the issues as to all the instruments together, and directed a separate trial thereof as to each instrument, commencing with the will allowed. *Held,* that there was no ground of exception to this denial and direction.

APPEALS by Julius S. Shailer, executor, the Massachusetts Baptist State Convention, and certain heirs at law of Miss Sarah Bumstead, from a decree of the judge of probate, allowing a a will, dated April 7, 1853, and a codicil thereto, dated September 30, 1857, as the last will of Miss Bumstead, who died on March 21, 1865, at the age of ninety-one years.

Trial at October term 1867, before *Wells,* J., who reported the case for the revision of the full court in substance as follows :

The testatrix made a will on July 3, 1851, disposing of part

of her estate, giving the same to the Massachusetts Baptist State Convention, and naming no executors. The will of April 7, 1853, revoked the former one, made less valuable provision for the Baptist Convention, and named Michael Hayden and Julius S. Shailer executors. The codicil thereto, of September 30, 1857, gave the residue of her estate to Hayden, revoked the appointment of Shailer as executor, and named Hayden to be "sole executor of my said will, and with the consultation of said Julius S. Shailer to have the settlement of my estate."

"Issues were framed as to each of these three instruments, in accordance with the allegations of the heirs at law, as follows: 1. That the testatrix was of unsound mind. 2. That the execution of the instrument was procured by the fraud and undue influence of Hayden and Shailer. 3. That the instrument was signed by the testatrix in ignorance of its contents. 4. That the will of 1853 had been fraudulently altered by Hayden or Shailer.

"At the hearing to frame issues, the Baptist State Convention and the heirs at law insisted that all the issues in all the cases should be tried together. But it being alleged that the testatrix had suffered from a severe illness between 1853 and 1857, by which both her bodily and mental powers were seriously affected, it was ordered that the issues relating to the several instruments be tried separately, unless the judge who should preside at the trial should otherwise direct.

"At April term 1867 the issues relating to the will of 1853 were submitted to a jury, and a verdict rendered in support of the will upon the 1st and 4th issues, and against it upon the 2d and 3d issues; but the verdict was set aside as to the 2d and 3d issues, on the ground that it was contrary to the evidence, or without sufficient evidence. At October term 1867 the counsel for the contestants again applied to have the issues in all the cases tried together, and offered to waive the question of sanity of the testatrix in the other cases. But this request was denied, and the case directed to be submitted to the jury upon the two remaining issues relating to the will of 1853 alone."

At the present trial, it appeared that the testatrix, at the date

of this will, was in her seventy-ninth year and had never been married; that in former years she had been very active, attending to her own business affairs; was of a decided character, not inclined to familiarity with those who approached her, but insisting upon deference from every one; and was a Baptist, and very strong in her religious belief; that in 1843 she owned a parcel of land upon Washington Street in Boston, on which were some wooden buildings of little value, in one of which she lived alone, and during that year Michael Hayden married one of her nieces, from which time until several years later than 1853 she with Hayden and his wife lived together as one family; that there was no issue of this marriage, and Mrs. Hayden died before the testatrix; that Julius S. Shailer was a Baptist minister, and from 1845 to 1854 was pastor of the society to which the testatrix belonged; and that in 1847 three shops were built on the front part of the land on Washington Street, and in 1852 four dwelling-houses on the back part.

" The contestants relied upon evidence of declarations of Miss Bumstead, made at the time of executing the will of 1851, and also both before and after that time, to the effect that she intended to devote the front lot as a sacred offering to the Lord, through the Baptist State Convention, and that she intended the back lot to be kept for the use of her needy relatives; from which they contended that it appeared that she had had a long cherished, settled and unvarying purpose " which was inconsistent with the provisions of the will of 1853; and they relied on the character and effect of these provisions to show that the will of 1853 could not have been the product of a free exercise of her mind.

" To prove that the testatrix was weak in body and mind at the time of executing the will, evidence was produced tending to show that she had ceased to attend to her business affairs, except to look over plans and accounts with Hayden or Shailer; that she did not attempt to write, and did little or no work of any kind; that when attempting to read she would very soon fall asleep; and that she walked, when going to church or elsewhere, with a shuffling of her feet, and leaning generally upon

the arm of Mr. or Mrs. Hayden. There was evidence that she would sometimes laugh and cry or whine at trifling causes; but the time when this occurred was not very definitely fixed. One witness testified that upon the occasion of a visit at the house in 1851 Miss Bumstead complained of a feeling of numbness. The contestants then offered to show by the same witness that at another visit, in July 1854, she found the testatrix affected with paralysis; and also to prove facts showing her mental and moral condition at that time. This evidence was excluded, as being too long after the date of the will on trial. The contestants then proposed to show that several of her family had been in advanced age affected with paralysis, accompanied by an enfeebling of the mental and moral powers, and that it was a family tendency; and claimed to connect the fact of her condition in 1854 with the numbness complained of in 1851, and the family tendency, as bearing upon the question of the condition of her mental and bodily powers in 1853;" but this testimony also was excluded.

" Evidence of her bodily and mental condition, at various periods subsequent to July 1854, and until her death in 1865, was also offered and rejected.

" To show undue influence by Hayden, various witnesses, mostly relatives, were called to testify to visits at various periods, whose testimony tended to show that Hayden had charge of all the property and business of Miss Bumstead; that she relied upon and demanded his constant attentions; that there was great familiarity between them, and tokens of affection, and that he or Mrs. Hayden always attended her to church or elsewhere when she went out. The witnesses generally testified that when visiting at the house they did not remember to have been ever left alone with Miss Bumstead; but there was no evidence that any of her relatives or friends were prevented from seeing her as they wished, nor that they might not have seen her alone if they had sought to do so, except as to two or three persons against whom Hayden made some objection on personal grounds.

" It also appeared that the testatrix was accustomed to con-

sult Shailer in regard to her business affairs and plans, and was attached to and confided in him; and he testified, on cross-examination, that he was her confidential adviser." And it appeared " that Hayden and Shailer went to the office of John J. Clarke, a counsellor at law, with a draft or memorandum which Shailer had written out, as he afterwards testified, under her direction, and employed him to prepare her will; that Mr. Clarke prepared the will, consulting with Hayden and Shailer only, and not seeing the testatrix at all, although it was testified that she was able to go abroad from her home; and Mr. Clarke testified that he should have gone to see her at her house, if he had been requested so to do. Hayden testified that he took the will so prepared to Miss Bumstead. It appeared that Hayden and Shailer were both present when it was executed, some days after it was so placed in her hands, and that after execution it was placed in Shailer's hands to be kept. Hayden testified that when he handed the will to Miss Bumstead, she took it and appeared to be reading it when he left the room. Shailer testified that on the day of execution of the will, and before its execution, he read it over to Miss Bumstead at her request.

" The attesting witnesses were a brother, sister, and brother-in-law of Hayden, who were not informed of the contents of the will. No persons were present except the testatrix, the attesting witnesses, and Hayden and Shailer; and it did not appear that the testatrix ever saw the will afterwards.

" As further evidence that the will so made was contrary to the real intentions of the testatrix, or that she was ignorant of its contents, and that it was procured by fraud and undue influence of Hayden and Shailer, the contestants offered to prove declarations of the testatrix, and of Hayden and Shailer, subsequent to the date of the will; and conduct of Hayden and Shailer in relation to the property and business of Miss Bumstead. The evidence of such subsequent declarations and conduct was excluded, so far as offered for that purpose; but the contestants were allowed to put in any evidence tending to show that relatives and friends were prevented or deterred in any way from free access to and communication with the testatrix, or that she

was in any way prevented from revoking or making any change in her will, if she had desired to do so." The evidence thus ex cluded, aside from declarations, comprised, among other things, deeds of real estate from the testatrix to Hayden, dated respectively March 21, 1854, and April 24, 1857; a mortgage to J. P. Cushing of both lots of the real estate on Washington Street, and an offer of proof, in connection with this mortgage, that it was made' at the suggestion of Hayden and Shailer, and that Hayden received the proceeds of it; the codicil, dated September 30, 1857; the appointment of Shailer, in December 1859, to be guardian of the testatrix as *non compos mentis,* and some of his proceedings as guardian; the writ and other papers in an action brought by Hayden in 1863 against the testatrix on two promissory notes, dated respectively in 1850 and 1852; the petitions of Hayden and Shailer, severally, to be appointed special administrator of the estate of the deceased, and the appointment of them jointly in June 1865; the inventory, and appraisal of the estate in December 1865; the amount of personal estate found by a special administrator appointed in the place of Hayden and Shailer; and evidence that no final account had been rendered by Shailer as guardian, nor any by Shailer and Hayden as special administrators.

" In reply, both Hayden and Shailer were examined as witnesses in support of the will. The contestants objected to their competency, but the objection was overruled.

"Hayden having denied, on cross-examination, that he had ever received any compensation for his services rendered to Miss Bumstead in taking the care and' oversight of her property and business affairs, was allowed to be interrogated in further cross-examination as to the consideration for her deed to him in 1857. The contestants then offered again to put the deed in evidence, to rebut any inference that such services were an inducement to the devise to him; but, as it did not tend in any manner to contradict the witness, the judge ruled that it was not competent for any other purpose, and excluded it.

" In cross-examination of Shailer, the contestants proposed to prove by him, that in 1855, at the request of Miss Bumstead, he

audited Hayden's accounts relative to her business, in conse-
quence of her being dissatisfied with them; and that, although
dissatisfied, she still continued Hayden in charge of the property.
This evidence was excluded."

The jury returned a verdict answering both issues in the neg-
ative.

*W. R. P. Washburn & H. G. Parker*, for certain heirs at law.

*F. W. Sawyer*, for other heirs at law.

*B. F. Brooks*, for the Baptist Convention.

*W. Gaston & W. S. Leland*, for Shailer.

*G. A. Somerby*, for Hayden.

COLT, J. Several questions arising upon the admission and
rejection of evidence at the trial are presented by this report.
One of the most important, whether we regard its practical con-
sequences, or the apparent, and to some extent real, conflict of
authority, relates to the admissibility of the declarations of the
testatrix made after the execution of the will. Such declara-
tions were offered to sustain the allegations of fraud and undue
influence, and ignorance of its contents, and were excluded.

That the instrument which contains the testamentary disposi-
tion of a competent person, executed freely and with all requi-
site legal formalities, must stand as the only evidence of such
disposal, is generally conceded. Such a will is not to be con-
trolled in its plain meaning by evidence of verbal statements
inconsistent with it; nor impaired in its validity and effect
by afterthoughts or changes in the wishes or purposes of the
maker, however distinctly asserted. It is to be revoked only by
some formal written instrument, some intentional act of destruc-
tion or cancellation, or such change of circumstances as amounts
in law to a revocation.

Any invasion of this rule opens the way to fraud and perjury;
promotes controversy; destroys to a greater or less degree that
security which should be afforded to the exercise of the power to
control the succession to one's property after death. But the
rule assumes that the will sought to be affected has once had a
valid existence. It is always liable to be impeached by any
competent evidence that it was never executed with the required

formality, was not the act of one possessed of testamentary capacity, or was obtained by such fraud and undue influence as to subvert the real intentions and will of the maker. The declarations of the testator accompanying the act must always be resorted to as the most satisfactory evidence to sustain or defend the will whenever this issue is presented. So it is uniformly held that the previous declarations of the testator, offered to prove the mental facts involved, are competent. Intention, purpose, mental peculiarity and condition, are mainly ascertainable through the medium afforded by the power of language. Statements and declarations, when the state of the mind is the fact to be shown, are therefore received as mental acts or conduct. The truth or falsity of the statement is of no consequence. As a narration, it is not received as evidence of the fact stated. It is only to be used as showing what manner of man he is who makes it. If therefore the statement or declaration offered has a tendency to prove a condition not in its nature temporary and transient, then, by the aid of the recognized rule that what is once proved to exist must be presumed to continue till the contrary be shown, the declaration, though prior in time to the act the validity of which is questioned, is admissible. Its weight will depend upon its significance and proximity. It may be so remote in point of time, or so altered in its import by subsequent changes in the circumstances of the maker, as to be wholly immaterial, and wisely to be rejected by the judge.

Upon the question of capacity to make a will, evidence of this description is constantly received; and when the issue is one of fraud and undue influence it is equally material. The requisite mental qualification to make a will might exist, and be entirely consistent with such a degree of weakness, or such peculiarity, as would make the party the easy victim of fraud and improper influence.

The evidence is here offered only to establish the allegations of ignorance of the will, and of fraud and undue influence. The verdict of the jury at a former trial having established, beyond controversy now, that the will was made by one in possession of the requisite testamentary capacity, its admissibility is to be considered only upon the remaining issue.

To establish the charge of fraud and undue influence, two points must be sustained: first, the fact of the deception practised, or the influence exercised; and, next, that this fraud and influence were effectual in producing the alleged result, misleading or overcoming the party in this particular act. The evidence under the first branch embraces all those exterior acts and declarations of others used and contrived to defraud or control the testator; and under the last includes all that may tend to show that the testator was of that peculiar mental structure, was possessed of those intrinsic or accidental qualities, was subject to such passion or prejudice, of such perverse or feeble will, or so mentally infirm in any respect, as to render it probable that the efforts used were successful in producing in the will offered the combined result. The purpose of the evidence in this direction is to establish that liability of the testator to be easily affected by fraud or undue influence, which constitutes the necessary counterpart and complement of the other facts to be proved. Without such proof, the issue can seldom, if ever, be maintained. It is said to be doubtful whether the existence and exercise of undue influence does not necessarily presuppose weakness of mind, and whether the acts of one who was in all respects sound can be set aside on that ground in the absence of proof of fraud or imposition. And it is certain that, however ingenious the fraud or coercive the influence may be, it is of no consequence, if there was intelligence enough to detect and strength enough to resist them.

The inquiry is of course directed to the condition at the date of the execution of the will; but the entire moral and intellectual development of the testator at that time is more or less involved; not alone those substantive and inherent qualities which enter into the constitution of the man, but those less permanent features which may be said to belong to and spring from the affections and emotions, as well as those morbid developments which have their origin in some physical disturbance. All that is peculiar in temperament or modes of thought, the idiosyncrasies of the man, so far as susceptibility is thereby shown, present proper considerations for the jury. They must

be satisfied, by a comparison of the will, in all its provisions and under all the exterior influences which were brought to bear upon its execution, with the maker of it as he then was, that such a will could not be the result of the free and uncontrolled action of such a man so operated upon, before they can by their verdict invalidate it.

As before stated, the previous conduct and declarations are admissible; and so, by the weight of authority and upon principle, are subsequent declarations, when they denote the mental fact to be proved. For, by common observation and experience, the existence of many forms of mental development, especially that of weakness in those faculties which are an essential part of the mind itself, when once proved, imply that the infirmity must have existed for some considerable time. The inference is quite as conclusive that such condition must have had a gradual and progressive development, requiring antecedent lapse of time, as that it will continue, when once proved, for any considerable period thereafter. The decay and loss of vigor which often accompanies old age furnishes the most common illustration of this. It is difficult to say that declarations offered to establish mental facts of this description are of equal weight, whether occurring before or after the act in question. But, if they are equally significant and no more remote in point of time, they are equally competent, and may be quite as influential with the jury.

The difficulty in the admission of these subsequent statements of the testator has been, that, while competent for the purpose above indicated, they are not, by the better reason and the most authoritative decisions, admissible to establish the fact of fraud and undue influence as one of the constituent elements of the issue. When used for such purpose, they are mere hearsay, which, by reason of the death of the party whose statements are so offered, can never be explained or contradicted by him. Obtained, it may be, by deception or persuasion, and always liable to the infirmities of human recollection, their admission for such purpose would go far to destroy the security which it is essential to preserve. The declaration is not to be wholly rejected

however, if admissible on other grounds; and it must be left to the judge carefully to point out how far it is to be rejected or received as evidence by the jury.

Ordinarily we should expect more or less evidence of the prior existence of those peculiarities which the subsequent declarations give evidence of; and in the reported cases this will generally be found to be so. It is not necessary to decide whether, in the entire absence of such evidence, subsequent declarations would ever be competent. Where a foundation is laid by evidence tending to show a previous state of mind, and its continued existence past the time of the execution of the will is attempted to be proved by subsequent conduct and declarations, such declarations are admissible, provided they are significant of a condition sufficiently permanent, and are made so near the time as to afford a reasonable inference that such was the state at the time in question.

The doctrines thus stated are maintained by the current of English and American authority.

In *Provis* v. *Reed,* 5 Bing. 435, the statements of the testator which were offered were regarded by the court as offered to prove specific acts of fraud and improper influence. The distinction here suggested does not seem to have been required in the case, and such statements were emphatically declared inadmissible, by Best, C. J., as rendering useless the precaution of making a will. The same doctrine is recognized, and the principle discussed, in *Marston* v. *Roe,* 8 Ad. & El. 14, where Tindal, C. J., goes somewhat fully into the matter, although the precise question was upon the revocation of the will.

In New York, in the case of *Jackson* v. *Kniffen,* 2 Johns. 31, the point was raised and decided; and the statement of the testator, that he had executed the will by force and for fear of being murdered, was rejected. The distinction taken in the more recent cases between such proof of exterior facts and such proof of mental *status* is not alluded to. And Spencer, J., in his dissenting opinion, favors the admission of the declarations, on the ground that they were the declarations of the sole party in interest at the time, because no one else could have an interest in a

will, living the testator. The whole matter is discussed more fully, and the distinctions accurately pointed out, in *Waterman* v. *Whitney*, 1 Kernan, 157. Subsequent declarations inconsistent with the will, in connection with other evidence tending to prove want of mental capacity, are held by Selden, J., and a majority of the court, to be competent, upon a full review of the decisions.

In Connecticut the same rule prevails, and was stated in *Comstock* v. *Hadlyme Ecclesiastical Society*, 8 Conn. 254.

In Vermont, in the case of *Robinson* v. *Hutchinson*, 26 Verm. 47, where the question is fully considered, Isham, J., says : " We do not perceive any serious objection to the admission of this testimony, under that limitation, when the declarations were made so near the time of the execution of the will that a reasonable conclusion may be drawn as to the state of mind of the testatrix at the time the will was executed. Weakness of mind arising from advanced age, in connection with causes. suggested in this case, is progressive and permanent in character It exists in the mind itself, and therefore it is that weakness of mind at the time of making the will may be inferred from weakness subsequent, as much so as imbecility of mind under similar circumstances."

In *Moritz* v. *Brough*, 16 S. & R. 402, the supreme court of Pennsylvania held declarations admissible to show mental condition. See also *McTaggart* v. *Thompson*, 14 Penn. State, 149 154.

In the recent case of *Boylan* v. *Meeker*, 4 Dutcher, 274, the whole subject is discussed. The issues there were, incapacity forgery of the will, fraud practised by inducing signature to a paper without knowledge that it was a will. The court say that upon a review of the case no doubt can be entertained of the testator's capacity. The contestants relied on the conduct and declarations of the testator to show that he never knew afterwards of the existence of the will, and therefore could not have knowingly executed the paper. It appears that the declarations were offered on the broad ground that, even if the testator had testamentary capacity, yet he never executed the will, because

of his declared ignorance of any such paper. In the discussion of the case, the court seem to regard ignorance of a fact existing at any particular time as not evidence of a state of mind in any sense affecting its capacity. But, however this may be, the whole case clearly recognizes the admissibility of subsequent declarations to prove mental condition, and is in harmony with the main current of authority. The declarations were held incompetent in that case, but it was upon the ground that the evidence was offered to support the act of fraud charged, and had no tendency to establish mental condition.

Two cases in North Carolina are apparently in conflict with these authorities. *Reel* v. *Reel,* 1 Hawks, 248. *Howell* v. *Barden,* 3 Dev. 442. In the first of these, the court follow, and approve of, the dissenting opinion of Spencer, J., in *Jackson* v. *Kniffen, supra;* and, in the last case, the court, by Ruffin, J., declare themselves bound by the former decision. It does not appear what were the precise declarations in this case; but in *Reel* v. *Reel,* in connection with the evidence that the mind of the testator had been greatly impaired by previous habits of intoxication, and had been weak from his youth, the declarations admitted may be held competent, without overruling *Jackson* v. *Kniffen.* See also *Cawthorn* v. *Haynes,* 24 Missouri, 236; 3 Lead. Cas. in Eq. (3d Am. ed.) 503, note; 1 Redfield on Wills, 551–561.

This discussion, though thus prolonged, may not be dismissed without presenting another view upon which the evidence under consideration may be competent. A will made when fraud or compulsion is used may nevertheless be shown to be the free act of the party, by proof of statements in which the will and its provisions are approved, made when relieved of any improper influence or coercion. It is always open to inquiry whether undue influence in any case operated to produce the will; and, as the will is ambulatory during life, the conduct and declarations of the testator upon that point are entitled to some weight. Indeed, the fact alone that the will, executed with due solemnity by a competent person, is suffered to remain unrevoked for any considerable time after the alleged causes have ceased to oper-

ate, is evidence that it was fairly executed; to meet which, to some extent at least, statements of dissatisfaction with or want of knowledge of its contents are worthy of consideration and clearly competent, however slight their influence in overcoming the fact that there is no revocation.

All this evidence, under whatever view it is admitted, is competent only and always to establish the influence and effect of the external acts upon the testator himself; never to prove the actual fact of fraud or improper influence in another.

Coming now to the application of these rules to the case here presented, we cannot avoid the conclusion that the report shows that evidence of the subsequent declarations of the testatrix, to the effect that the will so made was contrary to her real intentions, or that she was ignorant of its contents, should have been admitted. The character and habits of the testatrix in her better days, the whole of her later life, with her expressed purposes · and wishes up to the time of the will, were exhibited in evidence. With a considerable degree of physical weakness, that loss of vigor and activity in the mind, which indicates in persons of her habits and years the increasing infirmities and decay of old age, was shown to exist at and before the date of the will, for the purpose of increasing the probability that she was the victim of the improper designs of others.

The precise statements are not reported, nor does it appear at what precise time they were made, but they were offered to show either ignorance of the contents of the will, or that they were contrary to her real intentions, and that the will was improperly obtained by the fraud and undue influence of the executors named.

As we have already seen, this evidence was not competent as a declaration or narrative to show the fact of fraud or undue influence at a previous period. But it was admissible not only to show retention or loss of memory, tenacity or vacillation of purpose existing at the date of the will, but also in proof of long cherished purposes, settled convictions, deeply rooted feelings, opinions, affections or prejudices, or other intrinsic or enduring peculiarities of mind, inconsistent with the dispositions made

in the instrument attempted to be set up as the formal and deliberate expression of the testatrix's will; as well as to rebut any inference arising from the non-revocation of the instrument. They were not rejected as too remote in point of time, or as having no tendency in their character to sustain the fact claimed to exist.

In connection with the evidence thus offered and rejected, the contestants offered also the declarations and conduct of Hayden and Shailer, named executors, subsequent to the date of the will. And this brings us to another important question in the case. The evidence, for the purpose for which it was offered, was, we think, properly excluded. It was not proposed thereby to contradict their testimony. The admissions of a party to the record against his interest are, as a general rule, competent against him; and this rule applies to all cases where there is an interest in the suit, although other joint parties in interest may be injuriously affected. But it does not apply to cases where there are other parties to be affected who have not a joint interest, or do not stand in some relation of privity to the party whose admission is relied upon. A mere community of interest is not sufficient. Devisees or legatees have not that joint interest in the will which will make the admissions of one, though he be a party appellant or appellee from the decree of the probate court allowing the will, admissible against the other legatees In modern practice, at law even, the admissions of a party to the record who has no interest in the matter will not be permitted to be given in evidence to the prejudice of the real party in interest.

In this case, it does not appear at what time after the date of the will these declarations were made, whether before or after the death of the testatrix, or before or after the offer of the will for probate; and perhaps it is not material. They stand upon the same ground with statements made at any time since the date of the will, by any other devisee or legatee named in the will, or heir at law or legatee under the former will of 1851, whose interests are affected and who is a party to this record. Before the death of the testatrix, the interest of all these parties

in a will, liable at any time to be revoked, was not such a direct interest as should render their admissions competent against other parties. The separate admissions of each, made after the act, that the will was procured by their joint acts of fraud or undue influence, cannot be permitted to prejudice the other. Such statements are only admissible when they are made during the prosecution of the joint enterprise. Admitting for the present that any interest in a will obtained by undue influence cannot be held by third parties, however innocent of the fraud, and that the gift must be taken tainted with the fraud of the person procuring it, still it by no means follows that the interest of the other innocent legatees should be liable to be divested by the subsequent statements of the parties procuring the will. Such a rule would violate all sense of right, and is not sustained by the decisions.

The principal case, most often cited in support of the doctrine that such admissions are competent, is *Atkins* v. *Sanger,* 1 Pick. 192. The will was contested on the ground that the testatrix was not of sound mind and had been unduly practised upon. The declarations of one of the executors named, who were the principal legatees, were offered to show the circumstances attending the making of the will. Their admissibility was expressly urged on the ground that the parties to the record could not, as the law then was, be called as witnesses, and there was no way of proving the facts. The chief justice, after a short consultation with his brethren, said the court were inclined to admit the declarations as to facts which took place at the making of the will, but added that the decision did not interfere with *Phelps* v. *Hartwell,* 1 Mass. 72. This is the whole of the case. It is to be noted that the case was heard before the full court without a jury. The rule may have been less carefully laid down than it would have been if the question had arisen on the admissibility of the evidence in a jury trial. Under the present law of this Commonwealth making parties to the record witnesses, illustrated in this very case by calling the parties whose admissions were offered and subjecting them to the cross-examination of the contestants, we cannot think

the rule now contended for would have been adopted, as it seems to have been in *Atkins* v. *Sanger*.

In *Ware* v. *Ware*, 8 Greenl. 42, which was an appeal from the decree allowing probate of John Ware's will, the appellee was permitted to prove that Abel Ware, the only appellant, said, two or three weeks before the death of the testator, that he had his senses. This case, so far as it permits the opinions of a party on the question of sanity to be put in evidence against him, is in conflict with *Phelps* v. *Hartwell, supra;* but on a closer examination it seems to be in harmony with the law as here stated. It does not appear that the appellant was not the sole party in interest. The fact that he was alone interested is to be inferred; for Mellen, J., in reference to this point, says that by law the confessions of a party may always be given against him and his interest, but not thereby to defeat or impair the rights of others claiming under him.

Upon principle, and by the weight of decided cases, we think there was no error at the trial in the present case in this respect. *Clark* v. *Morrison*, 25 Penn. State, 453. *Titlow* v. *Titlow*, 54 Penn. State, 222. *Osgood* v. *Manhattan Co.* 3 Cowen, 612. *Dan* v. *Brown*, 4 Cowen, 492. *Hauberger* v. *Root*, 6 W. & S. 431. *Thompson* v. *Thompson*, 13 Ohio State, 358. *Blakey* v. *Blakey*, 33 Alab. 616.

The conduct of Shailer and Hayden in relation to the property and business of the testatrix stands on the same footing with their admissions. It had no legal tendency to establish the issue on the part of the contestants. The act could not be invalidated, so far as others at least were concerned, by their subsequent conduct. The codicil of 1857, if freely and intelligently executed, would of itself fully establish the will of 1853. But the conduct of either in procuring it was clearly incompetent on these issues. All the other specific subsequent conduct offered seems to have consisted of independent and disconnected acts, not in any way related to the making of the will of 1853. Any subsequent acts of theirs, or of any one else, by which the testatrix was in any way prevented from revoking or making any change in her will if she desired, or by which her relatives and

friends were prevented or debarred in any way from free access to and communication with her, were expressly allowed to be shown. The deed of 1857 to Hayden, the consideration for which was inquired of in his cross-examination, was properly excluded as not tending to contradict his testimony. The facts inquired of were not material to the issue, and were not open to contradiction. The auditing of Hayden's accounts by Shailer in 1855, her dissatisfaction with and continued employment of Hayden, proposed to be proved in cross-examination of Shailer, were circumstances too remote in point of time to have any bearing upon the mental *status* at the date of the will.

It was further objected that Hayden and Shailer were not competent witnesses under the statute. But this is not a case where one of the original parties to the contract or cause of action in issue and on trial is dead. They are not parties in a representative capacity. There was no cause of action in existence till the death of the testatrix. The controversy is between living parties. The testatrix is in no sense a party to the original cause of action. Her act was only the subject matter of the investigation. The rule contended for would exclude parties on both sides in all cases where litigation should arise, growing out of the act of another during life. We cannot construe the proviso of the statute so as to exclude as witnesses all those who may be parties on one side or the other in all probate appeals like this; and we find no error in the ruling. Gen. Sts. *c.* 131, ᶴ 14. *Baxter* v. *Knowles,* 12 Allen, 114.

Facts showing the mental and moral condition of the testatrix in July 1854, and at various periods subsequent to that time, were offered, and excluded as being too long after the date of the will. To a great extent, it must be left to the presiding judge to determine upon the facts before him how far evidence of this description may have a tendency to throw light on the fact to be found, namely, the actual condition at the date of the will. Some limit must of course be had in applying practically the rules which govern the admission of this evidence. We do not perceive any reason to differ from the judge in the limit here applied. After July 1854 her mental condition must have

greatly changed.    Her advanced age and the paralysis with
which she was at that time seized seem to make that period a
proper limit for the evidence offered ; and we see no reason for
sustaining this exception.

In regard to the offer to show that several of the family of
the testatrix had been, in advanced age, affected by paralysis,
accompanied by an enfeebling of the mental and moral powers,
and that it was a family tendency, we are of opinion that no
sufficient foundation was laid for the admission of such evidence.
In questions of sanity, proof of hereditary tendency is compe-
tent in support of evidence of the existence of insanity in any
given case.    Here the sanity of the testatrix is not to be called
in question.    Her complaints of numbness in 1851, her physical
weakness and mental inactivity prior to the attack of paralysis
in 1854, do not justify the admission of the proof offered of
hereditary tendency.    No case is cited in which such evidence
has been admitted in aid of the proof showing mere weakness
of mind or eccentricity. 1 Redfield on Wills, 156, 157.  *Baxter*
v. *Abbott,* 7 Gray, 75.

The only remaining point arises upon the manner in which
the issues as framed were submitted to the jury by the presiding
judge.    It is claimed to be the duty of this court now to revise
the order, upon exceptions or appeal taken in the usual way.
In the matter of framing issues, proceedings in probate appeals
are conducted in accordance with the rules and practice in
equity.    The findings of the jury in such cases are availed of
to inform the court in matters of controverted facts which may
become material in settling the final decree.    They may be dis-
regarded, in whole or in part, if on the final hearing they are not
deemed important or relevant; or such new issues may from
time to time be framed and submitted as a just regard to the
rights of all may seem to require.

Three testamentary papers were here produced, purporting to
have been executed in three different years.    The like four issues
were presented as to each.    The court, having regard to the fact
alleged, that the mental capacity of the testatrix had been seri
ously affected by severe illness between the years last named

ordered the issues tried separately; and those relating to the will of 1853 have been accordingly twice tried. Two of the issues at the first and two at the last trial were found in favor of the will. We cannot see that any injustice has been or is likely to be done by submitting the issues in this way to the jury or that the trial of the issues upon the will of 1853 ought not now to be completed.

The exceptions having been sustained in the single respect above stated, the last verdict of the jury upon the issues relating to the will of 1853 is therefore set aside, and a new trial ordered upon the second and third issues relating to that will.